ISBRANDTSEN CO., Inc.
v.
UNITED STATES et al.
No. 11679.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 20, 1953.

Decided Jan. 21, 1954.

Writ of Certiorari Denied
June 1, 1954.

See 74 S.Ct. 852.

Fahy, Circuit Judge, dissented.

Mr. William L. McGovern, Washington, D. C., Messrs. John J. O'Connor, Thurman Arnold and Abe Krash, Washington, D. C., on the brief, for petitioner.

Mr. Ralph S. Spritzer, Special Asst. to the Atty. Gen., a member of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, Mr. Charles H. Weston, Special Asst. to the Atty. Gen., on the brief, for respondent United States.

Mr. Max E. Halpern, Asst. Gen. Counsel, Federal Maritime Board, Washington, D. C., a member of the bar of the Supreme Court of New York, pro hac vice, by special leave of Court, Mr. Allen C. Dawson, Washington, D. C., on the brief, for respondent Federal Maritime Board.

Mr. Elkan Turk, New York City, Messrs. Elkan Turk, Jr., Brooklyn, N. Y., and George F. Galland, Washington, D. C., on the brief, for intervenors Japan-Atlantic and Gulf Freight Conference, et al.

Mr. Neil Brooks, Associate Solicitor, Washington, D. C., Mr. Donald A. Campbell, Attorney, United States Department of Agriculture, Washington, D. C., on the brief, for intervenor Ezra Taft Benson, Secretary of Agriculture of the United States.

Before PRETTYMAN, BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

Petitioner, Isbrandtsen, is a steamship company flying the flag of the United States and engaged in the transportation of freight from Japan, Korea and Okinawa to the Gulf-Atlantic ports of the United States. It competes with the Japan-Atlantic and Gulf Freight Conference on this route. The Conference is a voluntary association composed of

eighteen common carrier steamship lines, thirteen of which are lines sailing under foreign flags and five of which are United States registered lines. It exists primarily to establish, by concerted action, uniform rates to be charged by the member lines. The basic agreement under which the Conference operates was first approved by the United States Maritime Commission in 1934 under § 15 of the Shipping Act of 1916.[1] Isbrandtsen is neither a signatory to this agreement nor a member of the Conference.

On December 24, 1952, the Conference filed a statement with the Board, pursuant to the requirements of General Order 76, proposing initiation on January 23, 1953 of an exclusive patronage contract/noncontract dual rate system[2] in the Japan-Atlantic trade.[3] Under the proposed system, shippers who refused to agree in writing to employ Conference lines exclusively would be charged, for the identical transportation and service, tariffs which were nine and one-half per cent higher than those charged shippers who had executed such agreements with Conference lines. And once this exclusive patronage contract had been entered into, even a single shipment with any non-Conference carrier would result in the shipper's being required to pay the Conference, as liquidated damages, fifty per cent of the freight charge which the shipper would have paid had such shipment been made in a Conference vessel. If such violations occurred more than once in any year, the shipper's contract with the Conference would be cancelled and he would not be permitted to enter into a new agreement until the liquidated damages had been paid in full. Since Isbrandtsen, carrying slightly less than one third of the total volume of trade on the Japan-Atlantic route, is the only non-member line competing with Conference vessels, the impact of this system upon Isbrandtsen is readily apparent.

In accordance with Board procedure, notice of the filing of the Conference's proposal was published in the Federal Register.[4] Isbrandtsen and the Attorney General, on behalf of the United States,

---

1. 39 Stat. 733 (1916), as amended, 46 U.S. C.A. § 814, as amended by Reorganization Plan No. 21, 64 Stat. 1273 (1950), 46 U.S.C.A. § 814 note. The United States Maritime Commission was the predecessor of the Federal Maritime Board.

2. Hereafter referred to as the "dual rate system."

3. In its brief the Board explains that General Order 76 was promulgated because "[f]ollowing the decision in *Isbrandtsen Co.* v. *United States*, 96 F.Supp. 883, S.D.N.Y.1951, the Board has deemed it necessary to be informed as to the reasonableness of the spread or differential between the dual rates." That order (46 Code Fed.Regs. part 236 (Cum.Supp. 1952)), effective November 11, 1952, insofar as pertinent here, provides:

   "§ 236.3 *Filing for initiation of contract/non-contract rates.* Steamship freight conferences proposing to establish contract/non-contract rates to become effective after the effective date of this part shall file with the Federal Maritime Board at least 30 days prior to the initiation of such rates, a statement containing:

   "(a) The amount of the spread or differential in terms of percentages or dollars and cents;

   "(b) The effective date;

   "(c) The reasons for the use of contract/non-contract rates in the particular trade involved, and the basis for the spread or differential between such rates; and

   "(d) Copies of the form of all contracts pertaining thereto.

   \*   \*   \*   \*   \*

   "§ 236.6 *Notice.* All information filed pursuant to this part shall be available for inspection by interested parties at the Regulation Office of the Board. A notice of the filing of the statement required under §§ 236.2 and 236.3 will be published in the FEDERAL REGISTER as soon as practicable. Except as may be otherwise provided in cases arising under § 236.4, interested parties shall have twenty (20) days after the date of such publication within which to submit written comments relating to the information filed with the Board pursuant to this part. Said comments may include a statement of position with respect to approval, disapproval or modification, together with a request for hearing, should such hearing be desired."

4. 17 Fed.Reg. 11888 (1952).

filed written comments with the Board and requested a hearing, as provided in General Order 76.[5] They charged that the proposed agreement for a dual rate system was unlawful and that the Board lacked the authority to approve such a system. Isbrandtsen also charged that irreparable injury would be inflicted upon it if this dual rate system were permitted to go into effect.

So far as the particulars of the arguments pro and con before the Board are concerned, Isbrandtsen, on the one hand, contended that the purpose of this system was to drive it out of business by imposing a penalty upon any shippers who used its line; and that the Conference had failed to justify the reasonableness of the differential in accordance with statutory requirements.[6] On the other hand, the Conference, in defending its proposal, maintained that such exclusive patronage rates had previously been used by the Conference; that the Conference steamship lines have provided the trade with stability, freedom from rate wars, and progressive improvements in services; and that the nine and one-half per cent differential between contract and non-contract shippers was reasonable because Isbrandtsen's rates are computed at ten per cent below Conference rates. On January 21, 1953, without a hearing, and based upon the information and comments filed pursuant to General Order 76,[7] the Board issued the order under attack here. The order permitted the proposed dual rate system to go into effect within forty-eight hours.[8] It also denied the requests by Isbrandtsen and the Attorney General for an immediate hearing of the issues prior to the initiation of the system and for suspension of the system pending such a hearing. It did, however, grant a hearing at a date subsequent to institution of the system.

On January 22, 1953, the day following entry of the Board's order, Isbrandtsen filed this review petition under 5 U.S.C.A. § 1032[9] and on the same day we granted a temporary stay of the order under attack until Isbrandtsen's application for an interlocutory injunction could be heard and determined.

5. See note 3 supra.

6. See Isbrandtsen v. United States, D.C. S.D.N.Y.1951, 96 F.Supp. 883, affirmed 1952, 342 U.S. 950, 72 S.Ct. 623, 96 L.Ed. 706.

7. See note 3 supra.

8. The Board's order, after discussing the filing of the Conference application and of the comments and protests of petitioner and the Department of Justice, and the Board's consideration of such papers, states: "*It Appearing* therefrom that the Statement of the Conference filed December 24, 1952 complies with the requirements of General Order 76; and

"*It Not Appearing* from any of the above documents or other information now before the Board that the differential between said contract/non-contract rates is arbitrary, unreasonable, or unjustly discriminatory, nor that the initiation of the proposed contract/non-contract rate system will be unjustly discriminatory or unfair or detrimental to the Commerce of the United States, or will be in violation of the Shipping Act, 1916, as amended or will cause irreparable damage to Isbrandtsen Co., Inc.;

"It Is Ordered, that the requests of the Department of Justice and of Isbrandtsen Co., Inc. for a suspension of the proposed contract/non-contract rates of the Japan Atlantic and Gulf Freight Conference in the trade between Japan, Korea and Okinawa and United States Atlantic and Gulf ports, pending hearing and determination be denied; and

"It Is Further Ordered, that the requests of the Department of Justice and of Isbrandtsen Co., Inc. for a hearing on the said Protest and Comments be granted; and

"It Is Further Ordered, that such hearing be held before an Examiner of the Federal Maritime Board at a time and place to be fixed."

9. 64 Stat. 1129 (1950), 5 U.S.C.A. § 1032. This section provides in pertinent part: "The court of appeals shall have exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of * * * (c) such final orders of * * * the Federal Maritime Board * * * entered under authority of the Shipping Act, 1916, as amended * * *." Isbrandtsen also alleged that this court had jurisdiction under the Administrative Procedure Act, 60 Stat. 243, 5 U.S.C.A. § 1009.

This application was later granted, staying so much of the Board's order as purported to approve institution of the dual rate system agreement.[10] Petitions for certiorari, filed by the Board and the Conference, were denied by the Supreme Court of the United States.[11]

The United States, here as respondent under 5 U.S.C.A. § 1034,[12] and represented by the Attorney General, is in substantial accord with the position of Isbrandtsen. Its primary concern relates to the inconsistency of the dual rate system with the Sherman Act's [13] protection of the freedom of the market place. The Secretary of Agriculture of the United States, here as an intervenor, adopts the position of Isbrandtsen. His interest is that of a large shipper of goods attempting to obtain the best competitive price, a price which he believes to be threatened by the proposed dual rate system agreement. The Conference, here as an intervenor, supports the position of the Board.

We think there are only two issues to be decided: (1) does the challenged order possess the requisite finality for judicial review? and (2) does the Shipping Act require Board approval of the dual rate system before it can become effective?

This court has jurisdiction to review only final orders of the Board.[14] Whether or not the statutory requirements of finality are satisfied in any given case depends not upon the label affixed to its action by the administrative agency but rather upon a realistic appraisal of the consequences of such action. "The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control."[15] Thus, administrative orders are ordinarily reviewable when "they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." [16] Under this test, a final order need not necessarily be the very last order.[17]

We think the order under review meets the test of finality. The Board insists "that in declining to suspend the rates, [it] took only interlocutory action of a discretionary nature such as is not ordinarily reviewable." [18] That

---

10. This interlocutory injunction did not affect the Board's grant of a hearing after institution of the dual rate system agreement. We are advised that such a hearing is now in progress.

11. 1953, 345 U.S. 975, 73 S.Ct. 1122, 97 L.Ed. 1391.

12. This section provides that the action in court, by an aggrieved party for review of a final administrative order of the Maritime Board, "shall be brought against the United States." 64 Stat. 1130 (1950), 5 U.S.C.A. § 1034.

13. 26 Stat. 209 (1890), as amended, 15 U.S.C.A. § 1 et seq.

14. See note 9 supra.

15. Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 425, 62 S.Ct. 1194, 86 L.Ed. 1563. See also Powell v. United States, 1937, 300 U.S. 276, 284–285, 57 S.Ct. 470, 81 L.Ed. 643; and B. F. Goodrich Co. v. Federal Trade

Comm., 1953, 93 U.S.App.D.C. ——, 208 F.2d 829, 833–834.

16. Chicago & Southern Air Lines v. Waterman Steamship Corp., 1948, 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568; see also Philadelphia Co. v. Securities and Exchange Comm., 1947, 82 U.S.App.D.C. 335, 343–346, 164 F.2d 889, 897–900, certiorari denied 1948, 333 U.S. 828, 68 S.Ct. 452, 92 L.Ed. 1113; Pollak v. Public Utilities Comm., 1951, 89 U.S.App. D.C. 94, 98, 191 F.2d 450, 454, reversed on other grounds, 1952, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068.

17. Algonquin Gas Transmission Co. v. Federal Power Comm., 1 Cir., 1953, 201 F.2d 334, 337; see also Columbia Broadcasting System v. United States, note 15 supra; Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 143–144, 59 S.Ct. 754, 83 L.Ed. 1147; Phillips v. Securities and Exchange Comm., 2 Cir., 1948, 171 F.2d 180, 183.

18. Board's brief, p. 11.

action, however, attaches grave consequences to contractual and other business relations of Isbrandtsen. By denying Isbrandtsen's request to postpone operation of the dual rate system and to grant an immediate hearing, the Board virtually removed Isbrandtsen from the shipping market involved. Whether this removal was temporary or permanent, Isbrandtsen would inevitably suffer "real, immediate and incalculable" harm.[19] The Board's action was just as determinative of Isbrandtsen's rights as it would have been had the Board specifically and affirmatively approved the dual rate system agreement in accordance with the statutory requirements which we discuss next, or ruled that such approval was not required. "In these circumstances, it can hardly be said that the action assailed is not ripe for review, or that the Unions [here, Isbrandtsen] should be required to exhaust a dubious opportunity for hearing offered to them after the ax had fallen * * *."[20]

Since we view the order as final for purposes of our review, we must next determine whether the Shipping Act requires Board approval of dual rate system agreements before they can become operative. The Board's position here is that it may allow the agreement to go into effect in advance of formal approval because the basic Conference agreement authorizes dual rate system agreements. It maintains that the basic Conference agreement carries with it the "cover of authority" for subsequent changes of rates since the language of the basic agreement is as broad as that of the statute itself. If this is so, then no additional approval would be necessary to allow the dual rate system to go into effect.

We think, however, that the Board's view is inconsistent with the clear language of § 15 of the Shipping Act. That section provides in pertinent part:

"All agreements, modifications, or cancellations made after the organization of the commission [board] shall be lawful only when and as long as approved by the commission [board], and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

"Every agreement, modification, or cancellation lawful under this section shall be excepted from the provision of [the anti-trust laws]."[21]

"Agreements" referred to in the Shipping Act are defined to include "understandings, conferences, and other arrangements."[22] Clearly, a scheme of dual rates like that involved here is an "agreement" in this sense. It can hardly be classified as an interstitial sort of adjustment since it introduces an entirely new scheme of rate combination and discrimination not embodied in the basic agreement. But even if it were not a new agreement, it would certainly be classed as a "modification" of the existing basic agreement. In either case, § 15 requires that such agreements or modifications "shall be lawful only *when and as long as approved*" by the Board.[23] Until such approval is obtained, the Shipping Act makes it illegal to institute the dual rate system. And this illegality cannot be spirited away by action which the Board labels "interlocutory * * * of a discretionary nature."

In addition to its "cover of authority" argument, the Board seeks to jus-

19. Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 175, 71 S.Ct. 624, 95 L.Ed. 817 (Concurring opinion of Mr. Justice Douglas).

20. Farmer v. United Electrical Radio & Machine Workers, 1953, 93 U.S.App. D.C. ——, 211 F.2d 36.

21. 39 Stat. 733 (1916), as amended, 46 U.S. C.A. § 814, as amended by Reorganization Plan No. 21, 64 Stat. 1273 (1950), 46 U.S. C.A. § 814.

22. Ibid.

23. We understand the Board to agree that if the dual rate agreement here requires Board approval under § 15, the agreement could not be validated by the General Order 76 procedure prior to such approval. See Board's brief, p. 13.

tify the initiation of the agreement in issue by analogizing its action to that of the Interstate Commerce Commission with regard to rate orders. Under the Interstate Commerce Act, rates are effective and lawful merely upon filing.[24] In marked contrast, as we have seen above, the Shipping Act which governs here contemplates an entirely different scheme of regulation. It makes orders with respect to agreements unlawful until approved.[25] This pre-approval illegality stems from the fact that the Shipping Act specifically provides machinery for legalizing that which would otherwise be illegal under the anti-trust laws.[26] The condition upon which such authority is granted is that the agency entrusted with the duty to protect the public interest scrutinize the agreement to make sure that the conduct thus legalized does not invade the prohibitions of the anti-trust laws any more than is necessary to serve the purposes of the regulatory statute.[27] But until this is done, the agreement is subject to the operation of the anti-trust laws, under which price fixing agreements are illegal *per se.*"[28]

We hold that the action of the Board in allowing the dual rate system agreement to go into effect prior to approval is a final order within the meaning of the judicial review statute, and that it is contrary to the specific requirement of § 15 of the Shipping Act making Board approval a necessary condition precedent to initiation of such an agreement. The question whether the agreement itself is violative of the Shipping Act must await the decision of the Board in the exercise of its primary jurisdiction.[29]

The action of the Board allowing initiation of the dual rate system agreement will be set aside and the intervenor Conference will be enjoined from acting pursuant to such agreement until and unless it is approved by the Board under § 15.

So ordered.

FAHY, Circuit Judge (dissenting on jurisdictional grounds).

The jurisdiction of this court extends to review of final orders, only, of the Federal Maritime Board. 64 Stat. 1129, 5 U.S.C.A. § 1032. I do not think the order of January 21, 1953, is a final one. It (a) denies an application of Isbrandtsen and the Department of Justice requesting the Board to suspend a rate system which the conference was

24. 24 Stat. 380 (1887), as amended, 49 U.S.C.A. § 6(3). Express authority is given the Interstate Commerce Commission by § 15(7) to "suspend" the operation of a new schedule and to "defer" the use of new rates pending a hearing "but not for a longer period than seven months beyond the time when it would otherwise go into effect." 36 Stat. 552 (1910), as amended, 49 U.S.C.A. § 15(7). Absent suspension, the railroad carrier-made rates become the lawful rates by operation of law subject to a post-operative veto of the Commission after a hearing under § 15(1), 34 Stat. 589 (1906), as amended, 49 U.S.C.A. § 15(1). See Ayrshire Collieries Corp. v. United States, 1949, 335 U.S. 573, 581–583, 69 S.Ct. 278, 93 L.Ed. 243; and Algoma Coal & Coke Co. v. United States, D.C.E.D.Va.1935, 11 F.Supp. 487, 493.

25. Isbrandtsen-Moller Co. v. United States, 1937, 300 U.S. 139, 146, 57 S.Ct. 407, 81 L.Ed. 562.

26. See Georgia v. Pennsylvania R. Co., 1945, 324 U.S. 439, 456, 65 S.Ct. 716, 89 L.Ed. 1051; Keogh v. Chicago & N. W. R. Co., 1922, 260 U.S. 156, 161–162, 43 S.Ct. 47, 67 L.Ed. 183; United States v. Joint Traffic Ass'n, 1898, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259; United States v. Trans-Missouri Freight Ass'n, 1897, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007.

27. McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 87, 64 S.Ct. 370, 88 L.Ed. 544; see also Pennsylvania Water & Power Co. v. Federal Power Comm., 1951, 89 U.S.App.D.C. 235, 240–241, 193 F.2d 230, 234–235, affirmed 1952, 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042.

28. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129.

29. Isbrandtsen Co. v. United States, D.C. S.D.N.Y.1948, 81 F.Supp. 544, 546, appeal dismissed, Rederi v. Isbrandtsen Co., 1949, 336 U.S. 941, 69 S.Ct. 813, 93 L. Ed. 1099; Apgar Travel Agency v. International Air Transport Ass'n, D.C.S.D. N.Y.1952, 107 F.Supp. 706, 709–711.

to place in effect, and (b) sets a hearing on protests against the rates. Notwithstanding its recitals I do not construe this order as approving the rates or as otherwise final.

Assuming that putting the rates into effect by the conference would be unlawful without Board approval and that Isbrandtsen would be injured thereby, equitable relief against the conference and those members of the industry which compose it seems properly to be sought in a District Court. The impact of such rate action by the industry should not in legal contemplation be attributable to this order of the Board so as to make it final for our review. And it seems to me also that we should not construe the limited statutory authority of this court to include the power to enjoin the conference because the Board has refused to issue an order suspending the rates.